No. 112 February 22, 2024 69

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JENNY LOVE CASSIDY,
*Defendant-Appellant.*

Douglas County Circuit Court
20CR18602; A178897

William A. Marshall, Judge.

Argued and submitted January 25, 2024.

Daniel C. Silberman, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Brad Mullen, Certified Law Student, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jon Zunkel-deCoursey, Assistant Attorney General.

Before Tookey, Presiding Judge, Egan, Judge, and Kamins, Judge.

TOOKEY, P. J.

Affirmed.

**TOOKEY, P. J.**

Defendant appeals a judgment of conviction for one count of theft of services, ORS 164.125(1)(b).[1] In her first assignment of error, she contends that the trial court erred when it denied her motion for a judgment of acquittal (MJOA) as to that charge. Regarding the denial of her MJOA, defendant contends that the evidence was legally insufficient for the jury to determine (1) that the benefits derived as a result of her conduct were "commercial benefits" within the meaning of ORS 164.125(1)(b), and (2) that a rental property in which she let her parents stay without the owner's permission constituted a "business facility" within the meaning of ORS 164.125(1)(b). In her second assignment of error, she contends that the trial court erred when it sustained an objection to defendant's question to the manager of the rental property concerning circumstances under which the manager "would refuse to rent to somebody." We affirm.

## BACKGROUND

Since 2010, R, who lives in Florida, has managed a home in Elkton, Oregon, as a short-term vacation-rental property. R's father had the home built in 1986, and it is currently owned by R's mother's trust. R uses the property for her own vacations on occasion, as does her brother, who lives in Illinois. The property is stocked with some food supplies, like sugar, that guests can use.

R advertised the property as being available as a vacation rental on the internet, on a particular website, which she chose because it allowed her to maintain control over booking and reservations. R's practice was to personally speak with each guest prior to their stay at the Elkton property to personally "vet" them, and she also personally collected their fees and deposit. During defendant's trial, R explained that she spoke to each guest prior to their stay because "it's our family home and that's the way I do

---

[1] ORS 164.125(1)(b) provides that a person commits theft of services if:

"Having control over the disposition of labor or of business, commercial or industrial equipment or facilities of another, the person uses or diverts to the use of the person or a third person such labor, equipment or facilities with intent to derive for the person or the third person a commercial benefit to which the person or the third person is not entitled."

business," but that she would not refuse to let someone rent the property merely because she did not know them "very well." R also paid taxes based on the income that was produced from charging guests to stay at the property. The Elkton property was usually "booked" from May through September, with reservations "dwindle[ing] off" after September.

R employed two individuals in connection with the Elkton property: (1) defendant, whom R paid $85 to clean the property after each guest stayed; and (2) a caretaker, who mowed the lawn, "looked in on" the house, and acted as a "second set of eyes" for R.

In August 2019, defendant raised with R the possibility of defendant's parents staying at the property. Specifically, R and defendant discussed the possibility of defendant's parents staying at the property for free and defendant cleaning the house for free after their stay. R informed defendant that August was a very busy time of year and asked defendant to provide her with some dates in the future, but defendant never did.

Nevertheless, in early 2020, defendant allowed her parents to stay at the Elkton property without R's permission or knowledge, and defendant's parents gave defendant $100 for a cleaning fee. Defendant had also once previously allowed her parents to stay at the property without R's permission or knowledge.

While defendant's parents were staying at the Elkton property, R, who was unaware of their stay, asked the caretaker to check on the home because the electricity bills had been higher than usual. Upon discovering that defendant's parents were staying in the home, R called law enforcement personnel.

As a result of her conduct, the state charged defendant with one count of theft of services under ORS 164.125(1)(b). Specifically, the state alleged that defendant, "having control over the disposition of business facilitates, to wit: vacation rental property, did unlawfully and knowingly divert to the use of [defendant's mother] and / or [defendant's father] said facilitates of a value of $100 to $1,000 with intent to

derive a commercial benefit from [R] to which the defendant was not entitled."

At trial, defendant asked R to "elaborate on some circumstances in which you would refuse to rent to somebody." The state objected on the basis of relevance, and defendant responded "I'm trying to establish basically whether or not this place is open for rent, or if it's kind of a family home that, that vacation guests sometimes stay in." The trial court sustained the state's objection.

Then, at the close of the state's evidence, defendant moved for a judgment of acquittal, contending that the evidence was legally insufficient to support a conviction for theft of services. In support of that contention, defendant raised three arguments: that (1) "the property involved is not commercial in nature"; (2) the case is "civil not criminal"; and (3) "there is no evidence of the specific intent required to convict on a theft of services charge; intent to avoid payment for services." The trial court denied defendant's MJOA, and a jury convicted her of theft of services under ORS 164.125(1)(b).

## ANALYSIS

As noted, in her first assignment of error, defendant challenges the trial court's denial of her MJOA on two grounds. First, she contends that the evidence was legally insufficient to prove that the benefits derived as a result of her conduct—which she identifies as allowing "family members to stay at a third party's property for which [defendant] provide[d] cleaning services without the owner's express consent," and accepting "a $100 fee for cleaning the property"—were "commercial benefits" within the meaning of ORS 164.125(1)(b). Second, that the evidence was legally insufficient to prove that she diverted use of a "business facility" within the meaning of ORS 164.125(1)(b).

"In reviewing the trial court's denial of an MJOA, we view the facts in the light most favorable to the state, drawing all reasonable inferences in the state's favor." *State v. Leake*, 325 Or App 1, 3, 527 P3d 1054, *rev den*, 371 Or 476 (2023). "Where a trial court's denial of a motion for judgment of acquittal involves a question of statutory interpretation, we review that interpretation for legal error." *State v. Ritter*,

280 Or App 281, 285-86, 380 P3d 1160 (2016). "Ultimately, we review the trial court's denial of a motion for judgment of acquittal to determine whether, after viewing the facts in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.*

As an initial matter, we conclude that the first ground upon which defendant challenges the trial court's denial of her MJOA is not preserved.[2] "The general rule is that claims of error that have not been raised in the trial court will not be considered on appeal." *State v. Parkins*, 346 Or 333, 338, 211 P3d 262 (2009). "The question of whether a party has preserved an argument inevitably will turn on whether, given the particular record of a case, the policies underlying the rule of preservation have been served." *State v. Delaney*, 314 Or App 561, 574, 498 P3d 315 (2021), *aff'd*, 370 Or 554, 522 P3d 855 (2022) (internal quotation marks omitted). "The primary purposes of the preservation rule are to allow the trial court to consider a contention and correct or avoid any error, to allow the opposing party an opportunity to respond to a contention, and to foster full development of the record." *State v. Lulay*, 290 Or App 282, 289, 414 P3d 903, *rev den*, 363 Or 283 (2018).

In the context of a motion for a judgment of acquittal, "an objection as to the legal insufficiency of evidence to prove a claim on one theory does not have the effect of preserving all other possible theories of insufficiency; rather, parties must explain to the court and opposing party a specific reason for the asserted legal insufficiency." *State v. Murphy*, 306 Or App 535, 539, 475 P3d 100 (2020), *rev den*, 367 Or 559 (2021) (internal quotation marks omitted); *see also State v. Reyes-Castro*, 320 Or App 220, 228, 511 P3d 1115, *rev den*, 370 Or 472 (2022) ("An MJOA must state the specific theory on which the state's proof was insufficient.").

As noted, on appeal, the first ground upon which defendant challenges the trial court's denial of her MJOA is that the evidence was legally insufficient to prove that the

_____

[2] The state does not dispute preservation, "but we have an independent obligation to assess preservation, regardless of what position the parties take." *State v. Taylor*, 323 Or App 422, 427 n 3, 523 P3d 696 (2022).

two benefits derived as a result of her conduct—*i.e.*, allowing "family members to stay at a third party's property for which [defendant] provide[d] cleaning services without the owner's express consent," and accepting "a $100 fee for cleaning the property"—were "commercial benefits" within the meaning of ORS 164.125(1)(b). Defendant contends that those benefits are not "commercial benefits" because neither "constitutes a gain or advantage regarding the exchange of buying and selling commodities at scale" but are instead merely "personal benefits." As defendant sees it, a person violates ORS 164.125(1)(b) "by diverting a business's facilities or labor for the person's own commercial business purposes, not just for a personal benefit (whether financial or otherwise)."

        In contrast, in the trial court, defendant moved for a judgment of acquittal on three grounds—namely, that (1) "the property involved is not commercial in nature"; (2) the case is "civil not criminal"; and (3) "there is no evidence of the specific intent required to convict on a theft of services charge; intent to avoid payment for services."

        Regarding the first of those grounds—that the property involved was not commercial in nature—pointing to the definition of "commercial property" in ORS 105.850,[3] defendant argued that the Elkton property was not a "commercial property" because the evidence was insufficient to show that R operated the property "with the primary purpose of generating rental income." As defendant saw it, the legislature "clearly meant to protect businesses like hotels and cab services from people evading payment because they are commercial and held open to the public for the purpose of generating income" and that the Elkton property was "empty much of the year," had "a select few guests that stay occasionally," and that those guests were "carefully vetted" by R. Thus, defendant argued that because R did not "operate her [Elkton property] primarily for commercial gain" she was "not entitled to protection under ORS 164.125," and

_____

[3] ORS 105.850 provides that as used in certain statutes that concern a right of action when a city or mass transit district restricts use of the street traffic land immediately adjacent to a sidewalk abutting commercial property, "'commercial property' means land and improvements used in a business operated thereon for the production of income, one of the principal aspects of which is the storing of motor vehicles or the providing of lodging to travelers using private conveyances."

the case "should be dismissed because the legislature did not contemplate a noncommercial property owner *** being able to subject someone to criminal liability under ORS 164.125."

Regarding the second ground for defendant's MJOA in the trial court—that the case was civil in nature, not criminal—defendant argued that she was "a contract employee [who] exceeded the scope of her license to access [R's] property," which is a "tort, not a crime."

Finally, regarding the third ground for defendant's MJOA in the trial court—that there was "no evidence of the specific intent required to convict on a theft of services charge; intent to avoid payment for services"—defendant contended that there was no evidence that she "had the intent at any point to avoid payment for services or even that she understood payment would be required," and, in any event, "lodging at the [Elkton property] is not a service because the [Elkton property] is not commercial in nature."

In our view, none of the arguments defendant made in the trial court raised the issue of whether the benefits received were "commercial benefits" within the meaning of ORS 164.125(1)(b) in a manner sufficient to serve the policies underlying the rule of preservation. Defendant's argument on appeal concerning the meaning of "commercial benefit" under ORS 164.125(1)(b) raises the issue of the nature of the type of benefit a defendant must intend to derive to be guilty of theft of services under ORS 164.125(1)(b), but that is an issue that was not presented by defendant in her MJOA. Instead, as explained above, in her MJOA, defendant argued that the *property itself* was not commercial in nature insofar as it was not operated primarily for financial gain. We understand that argument to be akin to her argument on appeal that the property itself is not a "business facility" under ORS 164.125(1)(b); both her "commercial property" and her "business facility" arguments rely on the same evidence and assert that the Elkton property does not fall within the statute, because it was not primarily operated for a profit. Put another way, we understand her "commercial property" argument in the trial court to have been directed

at the "business facility" element of ORS 164.125(1)(b) not the "commercial benefit" element.

In reaching our conclusion regarding preservation, we also highlight that, prior to defendant's MJOA, the parties had discussed jury instructions and agreed on a definition of "commercial benefit" for those purposes—namely, "[c]ommercial benefit includes any economically quantifiable benefit that arises from access to or use of the business facility." That jury instruction was relied on by the state in responding to defendant's argument this is a "civil matter and not a criminal one." In advancing her MJOA arguments in the trial court, defendant could have argued that "commercial benefit" meant something different from the definition that she had previously agreed to for the purposes of jury instructions; she did not. It was incumbent on her to do so to preserve the issue she now raises on appeal.

In short, defendant's motion for a judgment of acquittal in the trial court would not have put the trial court or the state on notice that, in her view, the evidence was legally insufficient to establish that the benefits that she received—allowing "family members to stay at a third party's property" and accepting "a $100 fee for cleaning the property"—were "commercial benefits" within the meaning of ORS 164.125(1)(b). *Cf. State v. Drown*, 245 Or App 447, 459, 263 P3d 1057, *rev den*, 351 Or 401 (2011) (preservation rule satisfied where "defendant's motions for judgments of acquittal at the close of the state's case-in-chief put the state and trial court on notice of the issue that the state's evidence regarding her conduct *** was insufficient to establish that she had withheld necessary and adequate physical care for each of the children"). As such, defendant's MJOA did not provide the trial court with the opportunity to avoid the asserted error. *Lulay*, 290 Or App at 289 (one purpose of the preservation rule is to "allow the trial court to consider a contention and *** avoid any error").

Accordingly, because defendant failed to preserve for appellate review the argument that the evidence was legally insufficient to prove that allowing "family members to stay at a third party's property" and accepting "a $100 fee for cleaning the property" were "commercial benefits"

within the meaning of ORS 164.125(1)(b), and she does not ask for plain-error review, we do not address the merits of that argument. *Murphy*, 306 Or App at 539.

We next turn to defendant's argument that the evidence was legally insufficient to prove that she diverted use of a "business facility" within the meaning of ORS 164.125(1)(b).[4] In defendant's view, a "business facility" is "something built, installed, constructed, or established for the purpose of (or to facilitate) engaging in the economic exchange of buying and selling commodities or services." As defendant sees it, the trial court erred in denying her motion for a judgment of acquittal, because the Elkton property was not "established to perform or facilitate open economic exchange" and was not "primarily engaged in that function," and was, therefore, "not a 'business facility' under ORS 164.125(1)(b)." In advancing that argument, defendant contends that the Elkton property "was barely advertised publicly," "was only occasionally rented out to-pre-vetted guests" who had "an established relationship with [R]," and "was generally empty or reserved for private familial use."

The state responds that a "business facility" under ORS 164.125(1)(b) "is something which promotes the ease of an operation carried out for the purpose of profit." As the state sees it, a "vacation rental used to generate profit" qualifies as a "business facility" under ORS 164.125(1)(b). Further, in the state's view, "the record contained ample evidence of R's business practices—it was advertised, incurred costs, generated profit, and employed staff * * *—that established that her rental was a business facility. "

The issue whether the Elkton property qualifies as a "business facility" within the meaning of ORS 164.125 (1)(b) requires, as an initial matter, that we interpret that phrase. In construing statutes, we seek to "ascertain the legislature's intentions by examining the text of the statute in its context, along with relevant legislative history, and, if necessary, canons of construction." *State v. Cloutier*, 351 Or 68, 75, 261 P3d 1234 (2011). At the outset, we note that the question before us is not the outer contours of what

---

[4] The parties agree that, as charged, the state had to prove that the rental property constituted a "business facility" under ORS 164.125(1)(b).

constitutes a "business facility" under ORS 164.125(1)(b), but only whether that term encompasses the Elkton property, when viewing the evidence presented at trial in the light most favorable to the state.

ORS 164.125(1) provides, in pertinent part:

"A person commits the crime of theft of services if:

"* * * * *

"(b)   Having control over the disposition of labor or of business, commercial or industrial equipment or facilities of another, the person uses or diverts to the use of the person or a third person such labor, equipment or facilities with intent to derive for the person or the third person a commercial benefit to which the person or the third person is not entitled."

Neither "business" nor "facility" is defined for purposes of ORS 164.125, and we, therefore, "presume that the legislature intended the statutory terms to have their ordinary meanings." *State v. Cave*, 223 Or App 60, 67, 195 P3d 446 (2008), *rev den*, 345 Or 690 (2009). Consequently, we look to the dictionary—and in particular to *Webster's Third New International Dictionary*—for further guidance.[5] *Pride Disposal Co. v. Valet Waste, LLC*, 298 Or App 751, 759, 448 P3d 680, *rev den*, 366 Or 64 (2019).

As relevant here, "business" can mean "a usually commercial or mercantile activity customarily engaged in as a means of livelihood and typically involving some independence of judgment and power of decision" or "a commercial or industrial enterprise." *Webster's* at 302. "Facility," as relevant here, can mean "something that promotes the ease

---

[5] In advancing its arguments on appeal, the state cites the definition of "private business" and "facility" in *Black's Law Dictionary* (4th ed 1968).

"[W]hen a term is a legal one, we look to its established legal meaning as revealed by, for starters at least, legal dictionaries." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014). But the state does not directly contend, and we do not understand, the words "business" or "facility" in ORS 164.125(1)(b) to be legal terms of art. Consequently, in our analysis, we consider the definitions "business" and "facility" in *Webster's* to determine their ordinary meaning. *Kohring v. Ballard*, 355 Or 297, 304 n 2, 325 P3d 717 (2014) (explaining *Webster's* is "a dictionary with a 'descriptive' focus, reporting ordinary usage, as opposed to other dictionaries with a 'prescriptive' focus, reporting 'correct' usage").

of any action, operation, transaction, or course of conduct—usually used in plural," as in, "excellent *facilities* for graduate study" or "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." *Webster's* at 812-13 (emphasis in original). Textually, therefore, it appears that something can constitute a "business facility" if it is something that "promotes the ease of *** [a] course of conduct" involving "commercial or mercantile activity *** as a means of livelihood" or is "established to perform" such activity.

Statutory context does not suggest that the legislature intended "business facilities" to have anything other than its ordinary meaning. To the extent that context is helpful in this case, it supports a broad understanding of the term "business facilities" in ORS 164.125(1)(b).

The theft of services statute contains an expansive definition of "services." ORS 164.125(2) provides:

> "As used in this section, 'services' includes, but is not limited to, labor, professional services, toll facilities, transportation, communications service, entertainment, the supplying of food, lodging or other accommodations in hotels, restaurants or elsewhere, the supplying of equipment for use, and the supplying of commodities of a public utility nature such as gas, electricity, steam and water."

And although the word "services" is not used in ORS 164.125(1)(b), we think the expansive definition of services in ORS 164.125(2) suggests that, in enacting ORS 163.125(2), the legislature was concerned with theft from a range of businesses, including those that, like the rental property here, supply lodging.

Nevertheless, we also understand, as a contextual matter, that the term "business facilities" likely does not include "business equipment" or "labor." *State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005) ("[W]e assume that the legislature did not intend any portion of its enactments to be meaningless surplusage.").

Legislative history supports that understanding of "business facilities." The theft of services statute was first

enacted into law as part of the revised criminal code in 1971. Or Laws 1971, ch 743, § 133. The purpose of the statute is to "protect commercial enterprises that supply services to the public from thievish type conduct now only partially covered by existing statutes." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, § 133, 141 (July 1970). It aimed to "strengthen the protection for [certain] service-vending enterprises, and, in addition, include within its reach any other persons or businesses that furnish 'services,' including labor or professional services." *Id*.

The initial draft of the provision now codified at ORS 164.125(1)(b) was modeled on the New York Penal Law's theft of services statute. Minutes, Criminal Law Revision Commission, Subcommittee No. 1, May 17, 1968, 3. As explained by Project Director Donald L. Paillette, New York had adopted that statute to "plug[] an apparent gap" demonstrated by *People v. Ashworth*, 220 AD 498, 222 NYS 24 (1927), which was explained to the subcommittee as follows:

> "The defendants therein, a mill superintendent and his brother, were convicted of grand larceny as a result of having made unauthorized and personally profitable use of the mill's machinery, facilities and labor to spin a substantial quantity of wool for a certain company. The judgment was reversed on the ground that the corrupt use of the mill's facilities and labor did not constitute a theft of 'property' and, hence, could not be the subject of larceny."

Minutes, Criminal Law Revision Commission, Subcommittee No. 1, May 17, 1968, 4.

The commission also considered a shorter version of the text that now appears at ORS 164.125(1)(b) based on Michigan's theft of services statute:

> "A person commits theft if 'having control over the disposition of services of others to which he is not entitled, he knowingly diverts those services to his own benefit or to the benefit of another not entitled thereto.'"

Minutes, Criminal Law Revision Commission, Subcommittee No. 1, May 27, 1968, 2. Paillette explained that he proposed

the longer version taken from the New York statute, which was ultimately adopted, because "it covered the question of diverting equipment *or other property* of, for example, a manufacturing plant to the actor's own benefit." *Id.* at 3 (emphasis added).

In view of that text, context, and legislative history, we understand "business facility" to be a term that at least encompasses real property that is used by and is necessary for the operation of a particular business venture.

With that understanding, we conclude that the evidence in this case was legally sufficient for the jury to determine that the Elkton property qualified as a "business facility." Although R stayed in the Elkton property on occasion, evidence would have permitted a finding that the Elkton property was a "business facility": R testified that she "managed [the property] as a vacation rental property"; R had two employees who serviced the property in connection with the rental business and R incurred expenses as a result; R had been renting the property out for nearly a decade; R paid taxes on the income generated from renting out the property; and R advertised the property online as being available to rent. In addition, the property was stocked with supplies that guests could use and, although R spoke with people before their stay to "vet" them, she would not refuse to let someone stay merely because she did not know them "very well."

Further, contrary to defendant's contention that the Elkton property was not "primarily engaged" in a business function because it was "generally empty," the fact that a business has busy times and slow times does not render its facilities as something other than business facilities. In sum, we conclude that the evidence was legally sufficient for a jury to determine that the Elkton property was a "business facility" within the meaning of ORS 164.125(1)(b).

We turn next to defendant's second assignment of error, in which she contends that the trial court erred when it sustained the state's objection to defendant's question to R concerning circumstances under which R "would refuse to rent to somebody." As noted, during defendant's

trial, defendant asked R if R could "elaborate on some circumstances in which [R] would refuse to rent to somebody." The prosecutor objected based on relevance, and defendant explained that she was trying to establish "basically whether or not this place is open for rent or if it's kind of a family home that * * * vacation guests sometimes stay in." The trial court sustained the objection, and on appeal defendant assigns error to that ruling. Further, she contends that that error was preserved because, even absent an offer of proof, the question asked and defense counsel's explanation of relevance "inform[ed] the trial court of the substance of the evidence and its error in excluding it."

We have explained that "[e]videntiary error only requires reversal if it is not harmless." *State v. Cantwell*, 324 Or App 8, 10, 524 P3d 523, *rev den*, 371 Or 106 (2023). Further, "[e]vidential error is not presumed to be prejudicial." OEC 103(1). "Rather, defendant has the burden to demonstrate that the error affected a substantial right." *State v. Nguyen*, 293 Or App 492, 498, 429 P3d 410 (2018).

In this case, in order to determine whether the exclusion of the testimony was harmless, we would need to be able to evaluate the excluded testimony. But defendant did not make an offer of proof either with a narrative statement or with actual testimony in the jury's absence. Absent such information, defendant has not provided us with a record from which we can determine whether the error was harmless, even when we consider the "the question asked" and "defense counsel's explanation of relevance." *Cedartech, Inc. v. Strader*, 293 Or App 252, 261, 428 P3d 961 (2018) ("[U]ltimately, the offer permits the appellate courts to determine whether an error was likely to have affected the result of the case so as to constitute prejudicial error." (Internal quotation marks omitted.)); *State v. Krieger*, 291 Or App 450, 457, 422 P3d 300, *rev den*, 363 Or 599 (2018) (defendant's failure to provide an offer of proof, either with a narrative statement about the potential testimony or with the witness's actual testimony in the jury's absence, prevented this court from determining whether evidentiary error was harmless).[6]

---

[6]    Defendant also argues that her written MJOA "operated as an informal offer of proof." In her written MJOA, defendant argued that the Elkton property was not a "commercial property" because the Elkton property "sits empty much of

Affirmed.

<hr>

the year and has a select few guests that stay occasionally," and the "guests are people carefully vetted by [R] because of the home's sentimental value."

We disagree with defendant that her written MJOA constituted an informal offer of proof regarding the prosecutor's objection to defense counsel's question concerning "circumstances in which [R] would refuse to rent to somebody."